IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 9, 2015 Session

**STATE OF TENNESSEE v. DARRIN DEWAYNE DICKERSON**

**Appeal from the Circuit Court for Obion County**
**Nos. CC-14-CR-61, CC-14-CR-101      Jeff Parham, Judge**

_____

**No. W2015-00752-CCA-R3-CD  -  Filed June 13, 2016**
_____

An Obion County jury convicted the Defendant, Darrin Dewayne Dickerson, of casual exchange of marijuana, casual exchange of methamphetamine, and delivery of less than 0.5 grams of a Schedule II controlled substance, methamphetamine, within 1,000 feet of a drug-free school zone, a Class C felony.  The trial court merged the two methamphetamine convictions, and it sentenced the Defendant to an effective sentence of three years.  On appeal, the Defendant contends: (1) the evidence is insufficient to support his convictions; (2) that juror misconduct warrants a new trial; (3) the trial court erred when it sentenced him; and (4) the cumulative effect of the errors requires that he be given a new trial.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Bede Anyanwu, Jackson, Tennessee, for the appellant, Darrin Dewayne Dickerson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from allegations that the Defendant sold drugs to a paid informant working for the police.  An Obion County grand jury indicted the Defendant in case number CC-14-CR-61 for misdemeanor casual exchange of marijuana, occurring November 12, 2013.  In case number CC-14-CR-101, a grand jury indicted the Defendant for sale of 0.5 grams or more of methamphetamine within 1,000 feet of a drug free zone

and delivery of 0.5 grams or more of methamphetamine within 1,000 feet of a drug free zone, occurring April 11, 2014. The trial court consolidated these indictments for trial.

At the Defendant's trial, the parties presented the following evidence: Davis Crocker, an officer with the Obion County Sheriff's Department, testified that he worked with the judicial drug task force. During the time period of the Defendant's arrest, the task force organized undercover drug operations using an informant, Kenny Rogers. Mr. Rogers, who had four young children, contacted the police offering to help officers get the drugs "off the street." Officer Crocker and Mr. Rogers came to an agreement that included that, when Mr. Rogers found someone from whom he could purchase drugs, he would contact Officer Crocker, so they could arrange the drug buy. In exchange, the police would pay Mr. Rogers $140 per operation. Mr. Rogers made a total of forty-seven drug purchases from different sellers during the time that he worked with law enforcement.

Officer Crocker testified that, before each drug buy, he met with Mr. Rogers, searched him and his vehicle, and gave him pre-recorded drug buy money and a wireless transmitter. Officers also provided video recording equipment in his vehicle. Officer Crocker, through this equipment, listened as the drug buys occurred.

Officer Crocker described the November 12, 2013 drug buy, saying that after meeting with Mr. Rogers, he followed Mr. Rogers to the "public works" department building in South Fulton. The Defendant came outside of the building and pointed in front of Mr. Rogers's vehicle. Mr. Rogers got out of the vehicle, and, out of the view of the video camera, gave the Defendant the money. The Defendant and Mr. Rogers arranged for the Defendant to bring Mr. Rogers the marijuana at Mr. Rogers's home. Officer Crocker said that, in anticipation of this, he went to where he could see Mr. Rogers's home and the public works department, where the Defendant worked. Officers observed the Defendant leaving the public works building and traveling a short distance where he got out of his vehicle and met with someone in an older white car. Officers saw the Defendant walk toward the car, lean in the window, and hand money to the person inside. The white car then left the area. The Defendant drove by Mr. Rogers's house, threw something out the window, and called out "[t]here it is." Mr. Rogers retrieved the package and met with the officers at a predetermined location where Officer Crocker took possession of the drugs. The State offered an audio recording of the transaction.

On the audio, a man can be heard discussing owing money for a tree. Mr. Rogers, the informant, ensures that the amount to purchase the drugs is $140. He asks the other person heard on the recording if he should meet him back in the same spot at 3:00 p.m. to get the drugs, and the man says that he will bring the drugs to Mr. Rogers's house. Mr. Rogers tells the man that he will be sitting outside so that his children do not see. Mr.

Rogers then speaks to Officer Crockett in the recording saying that he gave the Defendant the money and that the Defendant agreed to drop the drugs at his house. Mr. Rogers is heard having a conversation with a man named "Rusty" and his wife. Mr. Rogers told his wife that he was at home and expecting the Defendant. He ended his conversation with her saying, "I see him now." Mr. Rogers can then be heard saying "where?" A short time later, Mr. Rogers had a discussion saying that the bag of marijuana seems a little small but that it is okay. Mr. Rogers said, "You threw it down on the ground. I could barely see it." Mr. Rogers was heard then having a conversation with someone about the bag seeming light and asking how much half a pound of marijuana would cost him.

Office Crocker described the April 11, 2014 drug transaction. He stated that Mr. Rogers told him that he had been in contact with the Defendant. The Defendant informed Mr. Rogers that he and the inmates that he worked with wanted to buy a particular kind of pill. He agreed to trade the Defendant five pills and $40 for some methamphetamine. Officer Crocker met with Mr. Rogers beforehand and then watched his meeting with the Defendant from a distance. He described Mr. Rogers's interactions with the inmates as "pretty friendly" because most of them knew him from working on houses in the area. Mr. Rogers gave the Defendant the money and Officer Crocker heard Rogers say that the pills were wrapped in the money. The two men arranged for the Defendant to leave the methamphetamine in the glove box of an old truck parked in Mr. Rogers's front yard. Officer Crocker met with Mr. Rogers and recovered the video and audio equipment.

Officer Crocker said that he and Officer Simmons watched the Defendant until he left work. He was en route to the Sheriff's Department, transporting inmates back to jail, and stopped near a church to hand Mr. Rogers's wife or girlfriend, Ms. Alisha Curry, the methamphetamine. Officer Crocker retrieved the methamphetamine from Ms. Curry. The officer then went and arrested the Defendant. When the Defendant was searched at the jail, officers found the $40 of drug buy money on his person. The audio recording of this transaction was played for the jury.

Officer Crocker testified that both locations where the drug transactions occurred were within 1,000 feet of a football field owned by the City of South Fulton and leased by the Twin Cities Youth Football League.[1]

During cross-examination, Officer Crocker testified that he did not video record his search of Mr. Rogers and his vehicle before the transactions. He agreed that the video recording and the audio recording were made separately. Officer Crocker agreed that, at the time of these transactions, Mr. Rogers was a handyman. Officer Crocker said that he

---

1 This proof established that the Defendant's offense could not be enhanced above the Class C felony classification for deliver of less than 0.5 grams of methamphetamine due to the offense's commission within a drug-free zone. T.C.A. § 39-17-432(b)(3).

did not test Mr. Rogers to determine whether he used drugs. He agreed that Mr. Rogers made approximately $6,580 working for the police and that the government did not tax this money. Officer Crocker agreed that his report indicated that he actually paid Mr. Rogers $160 for the methamphetamine drug transaction. Officer Crocker agreed that he did not arrest the Defendant for several hours after the initiation of the methamphetamine drug deal. Officer Crocker testified that there were no phone numbers on the Defendant's phone when officers arrested him. There were also no texts between the Defendant's phone and Mr. Rogers's phone that Officer Crocker could find. Officer Crocker agreed that he did not confiscate and look at the phone of either Mr. Rogers or Ms. Curry to determine if there had been any communication with the Defendant. He said that he felt confident in the Defendant's arrest based upon hearing the transaction between Mr. Rogers and the Defendant, seeing the Defendant hand something to Ms. Curry, and then determining that what he handed to her was drugs.

Officer Crocker agreed that he never recovered the pills that Mr. Rogers gave to the Defendant during the drug transaction. He said that the jail tested all five inmates who were with the Defendant, and none of them tested positive for oxycodone but two tested positive for marijuana. Officer Crocker said that he was unsure if the urinalysis conducted included a test for oxycodone. Officer Crocker said that he did not take a picture of the oxycodone pills because he intended to arrest the Defendant as soon as the transaction was completed. Officers were waiting for the Defendant to deliver the methamphetamine, however, so they could not arrest the Defendant immediately.

Officer Crocker said that he was aware that the Defendant and Mr. Rogers knew each other. He said he did not investigate Mr. Rogers's background before utilizing him as an informant.

Brock Sain, an agent with the Tennessee Bureau of Investigation, testified that the evidence submitted by Officer Crocker tested positive for marijuana and methamphetamine. The marijuana weighted 5.53 grams and the methamphetamine weighed 0.27 grams.

Kenneth Rogers testified that, one day while talking to Rusty Singleton, who was a judicial task force officer and a friend, he mentioned that he was tired of working on rental properties where he saw drugs in the houses where there were children. Officer Singleton asked Mr. Rogers to assist the task force by being an informant. Mr. Rogers agreed, and Officer Singleton introduced Mr. Rogers to Officer Crocker. Officer Crocker agreed to pay Mr. Rogers between $100 to $200 per drug purchase.

Mr. Rogers testified that he had known the Defendant for three years before purchasing drugs from him for law enforcement. He described the November 12, 2013

4

drug purchase, saying that Officer Crocker called Mr. Rogers and informed him that they were attempting to purchase drugs from the Defendant. Mr. Rogers met Officer Crocker at the football field, and Mr. Rogers called the Defendant. Officer Crocker gave Mr. Rogers $140, and Mr. Rogers immediately met with the Defendant and gave him the money. Mr. Rogers went back to his house, which was located a short distance away, and the Defendant arrived and tossed the drugs out the window, saying "Here you go." Mr. Rogers said that he picked up the marijuana off the ground and then met with Mr. Crocker and gave the drugs to him.

Mr. Rogers described the April 11, 2014 drug purchase. He said that on Thursday April 10, 2014, he and the Defendant spoke on the telephone. They agreed to exchange $40 and two or three narcotic pills for methamphetamine. On Friday morning, April 11, Mr. Rogers met with Officer Crocker, who gave him the pills and $40. He then went to meet with the Defendant, who was working on the road in front of the city park. Mr. Rogers said he and the Defendant met a few hundred feet from where the Defendant's crew was working. Mr. Rogers said he handed the Defendant the pills and the $40. Mr. Rogers and the Defendant agreed that the Defendant would leave the drugs in the glove box of the red pickup truck located at Mr. Rogers's house. Mr. Rogers said that he then went to Memphis to work. Mr. Rogers said he did not have any further contact with Officer Crocker or Ms. Curry that day.

During cross-examination, Mr. Rogers testified that the Defendant worked for the city of South Fulton. The two had known each other for over three years and were friends. Mr. Rogers said that at the time of these drug purchases he worked as a maintenance worker making $12 per hour. He said that he supported his fiancé and four children on this income. He also paid child support for four other children he had by another woman. Mr. Rogers testified that his fiancé had since left him and was living with Officer Singleton. He recalled being first approached by Officer Singleton and said that, one day when he arrived home from work, Officer Singleton was at his house with his fiancé. The two of them approached him about working as a confidential informant.

Mr. Rogers testified that he initially wanted to help law enforcement because of the situations that he saw children in while he was working. He and Officer Crocker did not discuss payment until their second meeting. Mr. Rogers said that the income from working with the police was supplemental, and he spent it on bills and his children.

Mr. Rogers explained that he could identify drug dealers from seeing them in their homes. He said that, while in their homes, he would see and smell items that led him to believe they were drug users. Mr. Rogers denied ever using drugs, conceding that he smoked marijuana while in high school. He said that he never saw Ms. Curry use drugs.

5

Mr. Rogers said that the Defendant knew that he had purchased drugs from other people. Mr. Rogers said that, even though he and the Defendant were friends, Mr. Rogers could not tell the Defendant that he was purchasing the drugs for law enforcement. The Defendant told Mr. Rogers that if Mr. Rogers was "ever looking for anything" to contact him.

Mr. Rogers said he first met the Defendant when the two were neighbors. The Defendant asked Mr. Rogers to put a new roof on his house, which he did. He then worked on the Defendant's home on several other occasions. Mr. Rogers said that there was nothing in the Defendant's house that indicated that he was a drug dealer. Mr. Rogers said that he had interacted with the Defendant's wife and children.

Mr. Rogers agreed that he talked to himself on the recording before the drug buys. He explained that he did so to keep himself calm because he was new to purchasing drugs. He explained that, some of the time, he was on the phone speaking with someone else. Mr. Rogers testified that he no longer worked with the task force and had since moved to another town.

Alisha Curry testified that in April 2014 she lived with Mr. Rogers. She said that Mr. Rogers went to Memphis one morning after he had set up a drug transaction with the Defendant. Ms. Curry said that same morning the Defendant pulled up onto the side of the road in his company vehicle. She walked from her front porch to the road to meet him, approaching his car from the passenger's side. He handed her the drugs and left. Ms. Curry said she took the drugs to her driveway where Officer Crocker was sitting, and she handed the drugs to him.

During cross-examination, Ms. Curry testified that she had been friends with the Defendant and his wife for a few years before this drug purchase. The two couples had been to each other's homes. Ms. Curry agreed that, at the time of trial, she and Officer Singleton were in a relationship. Ms. Curry denied that she introduced Mr. Rogers to the idea of working as an informant. She said that Mr. Rogers approached law enforcement about being an informant at a time when they were not struggling financially. She was unsure of his motives for so doing. She said she was present when the two were discussing the matter, but she was attending to the children part of the time.

Ms. Curry said that the only drug purchase that she assisted in was the last one on April 11. She did not know how many drug purchases Mr. Rogers participated in or how many people were arrested. Ms. Curry testified that she had not smoked marijuana in over six years and had never used any other illicit drugs. Ms. Curry recalled that when the Defendant dropped off the drugs to her that day that three or four inmates accompanied him. She did not recall the Defendant contacting her that day but said that

6

he had her number and had contacted her in the past. She did recall multiple phone calls between her and Mr. Rogers, and she believed that Mr. Rogers and Officer Crocker were also in contact on the day of the methamphetamine transaction.

Gina Dickerson, the Defendant's wife, testified that she had been in a relationship with the Defendant for more than twenty years. The two had one child together, who had recently turned eighteen. Mrs. Dickerson said that she and the Defendant were very close and spent most of their time together. She said that the Defendant had always been employed, except for two brief periods after he had been laid off.

Mrs. Dickerson said that she first met Mr. Rogers when he and his fiancé moved into a home near them. She said that Mr. Rogers worked on the Dickerson's roof and house as necessary. Mrs. Dickerson said that Mr. Rogers often approached her and the Defendant asking to borrow money because he could not feed his children, so Mr. Dickerson would offer him employment at their house. Mrs. Dickerson said that Mr. Rogers did not do a "very good job." She said he did not clean up his messes and would often make mistakes. She said Mr. Rogers also "made passes towards" her, so she asked the Defendant to no longer employ him.

Mrs. Dickerson described the passes, saying that Mr. Rogers complimented her cooking and then said that he and the Defendant needed to swap wives. He told her that she looked "nice" or "sexy" in a flirtatious way. She said, at one point, he said he was going to move in with her and that she could put the Defendant out. She said she responded by saying "I don't think so."

Mrs. Dickerson described Mr. Rogers as a, "habitual liar." As an example, she noted that he would not come to their house as scheduled. She said that he also illegally dumped the shingles off of their home, so he had to go and retrieve the shingles and properly dispose of them.

Based upon this evidence, the jury convicted the Defendant of casual exchange of marijuana, casual exchange of methamphetamine, and delivery of methamphetamine within 1,000 feet of a school zone. The trial court merged the two methamphetamine convictions, and it sentenced the Defendant to an effective sentence of three years.

## B. Sentencing

At sentencing, the parties presented arguments and then Mrs. Dickerson testified. She said that the plant where she worked had closed and that she and the Defendant and the three children who lived with them were relying upon his income. Mrs. Dickerson said that she had been in a relationship with the Defendant for twenty years, and she said

he was not violent or careless. He only drank occasionally, and he usually only left their home to go to work. She said that the two of them "st[u]ck to [them]selves" and did not do bad things. The two were members of a church and helped care for her sick mother and the Defendant's sick parents. Mrs. Dickerson said that her and the Defendant's daughter were "very attached" to the Defendant. She said that their daughter did not come to the trial because Mrs. Dickerson did not want her to hear the "lies" being told about the Defendant. Mrs. Dickerson asked the trial judge to allow the Defendant to come home to his family. She expressed her confidence that the Defendant would be successful on probation.

The Defendant testified that he was not a violent person and that he worked six to seven days per week. He said that his "so-called friends" stabbed him in the back and tried to set him up because they were jealous. He also expressed his confidence that he would be successful on probation. The Defendant said that he would like to be on probation so that he did not miss his daughter's prom and graduation from high school. The Defendant confirmed that his parents and Mrs. Dickerson's mother were all in bad health and that he helped to care for them.

Based upon this evidence and the arguments of the parties, the trial court found:

> Mr. Dickerson, you were previously found guilty after a jury trial of casual exchange of a controlled substance and delivery of a Schedule II controlled substance in CR-101. From those, I am going to merge Count 1 into Count 2. I'm merging the casual exchange into the delivery. So you will be found guilty of Count 2, delivery of a controlled substance.

> In CR-61 you were found guilty of a casual exchange of Schedule VI, a Class A misdemeanor.

> This cause came on to be heard today on the sentencing of the defendant upon a conviction of those offenses by a jury. In determining the appropriate sentence for these offenses, the Court has considered the evidence presented at trial and at the sentencing hearing, the presentence report, the principles of sentencing, and arguments made as to any sentencing alternatives, which I don't find there are any sentencing alternatives. I think the statute is pretty clear.

> The nature and the characteristics of the criminal conduct involved the evidence and information offered by the parties on mitigating and enhancement factors, statistical information provided by the Administrative Office of the Court, and the statement made by the [D]efendant on his own

8

behalf, from all of which the Court finds that, the [D]efendant, is a range 1 standard offender. However, as a range 1 standard offender, this is a little different, because this is a mandatory drug-free zone violation.

So as a standard offender, you would have been entitled to a minimum sentence at 30 percent. Because this happened in a drug-free zone, standard really doesn't apply as it is a day-for-day sentence.

The Court finds the [D]efendant's motion to exclude Enhancement Factor Number 1 previous criminal convictions is well-taken, and I do not find that to be an enhancement factor.

The Court finds that Enhancement Factor 14 is applicable in that there was an abuse of position of public trust. You were a City worker. You – the jury found that you committed these crimes using a City vehicle on City time. The Court further finds that there were no mitigating factors.

The Court has considered the presentence report, and as to CR-101 the minimum sentence on that is three years in your range. So the Court is going to hereby sentence you in a Class C felony to three years in the Tennessee Department of Correction. I'm going to assess you a two thousand dollar mandatory minimum fine, which is required by the statute.

In CR-61 casual exchange, I'm going to sentence you on that charge to 11 months and 29 days to run concurrent with CR-101 Count 2. I'm going to waive the fine in count -- in CR-61, you will have the one mandatory minimum fine.

Mr. Dickerson, I would note that you've been a hard worker.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions; (2) that juror misconduct warranted a new trial; (3) the trial court erred when it sentenced him; and (4) the cumulative effect of errors that occurred requires he be given a new trial.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions based upon several arguments. First, he asserts, the audio recordings are "woefully insufficient." He notes that the Defendant's voice cannot be "intelligibly" heard on the November 12, 2013 recording, meaning that there is no identification of the relevant speakers. He further contends that what is heard on that recording does not comport with Mr. Rogers's testimony. He similarly contends that his voice cannot be heard on the April 11, 2014 recording. He further asserts that the reason that his voice cannot be heard is because the alleged drug transactions never took place. The Defendant further asserts that the audio recordings did not prove that he sold or delivered drugs on either occasion. Second, the Defendant argues that Mr. Rogers's testimony cannot be relied upon because he was a paid informant. Third, the Defendant contends that the chain of custody was not sufficiently established because officers did not observe the Defendant give the drugs to Mr. Rogers or Ms. Curry and did not have the drugs in sight between the time of the exchange and the time that they confiscated the drugs. Fourth, the Defendant takes issue with Officer Crocker's testimony as nothing but a recitation of the narrative that he heard Mr. Rogers say on the audio recording. Finally, the Defendant takes issue with the lack of video evidence.

The State counters that the evidence is sufficient to sustain the Defendant's convictions as there is direct proof of his guilt. Addressing the Defendant's specific arguments, the State asserts that the Defendant failed to object to the authentication of the audio recording and the chain of custody, and so he has waived these issues. The State further asserts that the jury was entitled to weigh the testimony from Mr. Rogers as a paid informant. The State asserts that the Defendant has waived a hearsay objection to Officer Crocker's testimony and that Officer Crocker's testimony did not amount to hearsay. Finally, the State asserts that it was within the jury's providence to determine whether the lack of video evidence rendered the evidence insufficient.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the

10

jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-17-418 provides the following, in pertinent part:

> Simple possession or casual exchange. (a) It is an offense for a person to knowingly possess or casually exchange a controlled substance unless the

substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice.

(b) It is an offense for a person to distribute a small amount of marijuana not in excess of one half (½) ounce (14.175 grams).

T.C.A. § 39-17-418(a)-(b) (2014). The exchange of a controlled substance, including a transaction where money is exchanged for the controlled substance, is "casual" when it is without design. *See State v. Helton*, 507 S.W.2d 117, 120 (Tenn. 1974).

Tennessee Code Annotated section 39-17-417(a)(2) makes it an offense to knowingly deliver a controlled substance. Section (c)(2)(A) states, "Any other Schedule II controlled substance, including cocaine or methamphetamine in an amount of less than point five (0.5) grams, is a Class C felony and, in addition, may be fined not more than one hundred thousand dollars ($100,000) . . . ." "Knowingly" is defined as when a person acts "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). "A violation of [section] 39-17–417, . . ., that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park" results in enhanced punishment. T.C.A. § 39-17-432(b)(1). A defendant may be convicted under the Drug-Free School Zone Act if he was merely traveling through the school zone while in possession of controlled substances, even if he was arrested elsewhere. *See State v. Vasques*, 221 S.W.3d 514, 523 (Tenn. 2007). Possession of drugs within a drug-free school zone is not a separate offense or an essential element of the underlying drug offense–it merely enhances the penalty for violations of Tennessee Code Annotated section 39-17-417 that take place within a school zone. *See State v. Smith*, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000).

As previously stated, pursuant to our standard of review, we do not reweigh the evidence, but we view the evidence in the light most favorable to the State. Viewed in that light, the evidence proved that the Defendant met with Mr. Rogers on November 12, 2013, in South Fulton. The Defendant agreed to sell Mr. Rogers, whom he had known for several years, marijuana. Law enforcement officers met with Mr. Rogers before the meeting and placed audio recording equipment on his person and video recording equipment in his car. They then provided Mr. Rogers with bills that had been photocopied. Mr. Rogers met with the Defendant and gave him the buy money. The Defendant later drove by Mr. Rogers's house and dropped off the marijuana. This evidence is sufficient to sustain the Defendant's conviction for casual exchange of marijuana.

12

Viewed in this same light, the evidence showed that on April 11, 2014, the Defendant agreed to sell Mr. Rogers methamphetamine in exchange for $40 and some oxycontin pills. After being searched, wired, and given money by law enforcement, Mr. Rogers met with the Defendant and gave him the $40 in photocopied drug buy money and the pills. The Defendant then later went to the Defendant's home and handed the methamphetamine to Ms. Curry. Ms. Curry gave the drugs to law enforcement who arrested the Defendant a short time later. The Defendant had on his person at the time of arrest the $40 in drug buy money. The location to where the Defendant delivered the methamphetamine was within 1,000 feet of a drug-free zone. This evidence is sufficient to sustain the Defendant's conviction for delivery of methamphetamine within 1,000 feet of a drug-free zone.

The Defendant's specific contentions are without merit. He first takes issue with the audio recording of the drug transactions, stating that his voice cannot be "intelligibly" heard on either recording and that those recordings did not prove that he participated in a drug sale. The elements of the offense for which the Defendant was convicted do not require that the State offer an audio recording of the transaction. Officer Crocker worked with Mr. Rogers to complete a drug sale with the Defendant. They equipped Mr. Rogers with audio equipment and video equipment. As to the November drug transaction, the video equipment shows, and Mr. Rogers and Officer Crocker observed, the Defendant meeting with Mr. Rogers at the time of both drug sales. The video shows Mr. Rogers handing the Defendant money. Officer Crocker then observed the Defendant leaving the meeting place and traveling a short distance where he got out of his vehicle and met with someone in an older white car. Officers saw the Defendant walk toward the car, lean in the window, and hand money to the person inside. The white car then left the area. The Defendant drove by Mr. Rogers's house, threw something out the window, and called "[t]here it is." Mr. Rogers retrieved the package and met with the officers at a predetermined location where Officer Crocker took possession of the drugs.

As to the April transaction, Officer Crocker observed Mr. Rogers meeting with the Defendant and heard him say that the pills were wrapped in the money. Upon learning that the two men arranged for the Defendant to leave the methamphetamine in the glove box of an old truck parked in Mr. Rogers's front yard, Officer Crocker and Officer Simmons watched the Defendant until he left work. Officer Crocker saw the Defendant hand Ms. Curry the methamphetamine, and he retrieved the methamphetamine from Ms. Curry shortly thereafter. When the Defendant was searched at jail, officers found the $40 of buy money on his person.

We find that the actual recording of the Defendant's voice on the audio recording was not necessary to support his conviction, as there was ample other evidence proving

13

his guilt.

The Defendant next contends that Mr. Rogers's testimony cannot be relied upon because he was a paid informant and that the trial court should have admonished the jury about this. The State asserts that the Defendant has waived this issue for failing to ask for such instruction at trial. We agree with the State in this regard. *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Third, the Defendant contends that the chain of custody was not sufficiently established because officers did not observe the Defendant give the drugs to Mr. Rogers or Ms. Curry and did not have the drugs in sight between the time of the exchange and the time that they confiscated the drugs. We note that the record discloses that the officers may not have seen the drugs leave the Defendant's hands and come into the possession of Mr. Rogers or Ms. Curry, which is not legally required for a conviction, but, regardless, the Defendant failed to object to admission of the item until after it had been introduced. Indeed, the Defendant did not register an objection until after the State had rested its case. Under the circumstances, the failure to voice a contemporaneous objection waives the issue. *See, e.g., State v. Burton,* 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988) (failure to make contemporaneous objection to evidence resulted in waiver of issue); *State v. Davis,* 741 S.W.2d 120, 124 (Tenn. Crim. App. 1987) (failure to object to evidence "until after it was all placed before the jury" resulted in waiver of issue); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Fourth, the Defendant takes issue with Officer Crocker's testimony as nothing but a recitation of the narrative that he heard Mr. Rogers say on the audio recording. We disagree. During the November drug transaction, Officer Crocker saw the Defendant and Mr. Rogers meet. He saw Mr. Rogers hand the Defendant money on the video. He then saw the Defendant leave and meet with another man in a white vehicle before traveling to Mr. Rogers's house, where he stopped briefly and said "[t]here it is." Officer Crocker then retrieved marijuana from Mr. Rogers. During the April transaction, Officer Crocker again saw the Defendant meet with Mr. Rogers. He heard Mr. Rogers say that the pills were inside the money. Officer Crocker watched the Defendant leave his place of work, travel to meet Ms. Curry, and hand her something. Moments later, he retrieved methamphetamine from Ms. Curry. The Defendant was found in possession of the drug buy money. Officer Crocker provided more information than a recitation of what was heard on the audio recording.

14

Finally, the Defendant takes issue with the lack of video evidence. Again, the State is not required to offer a video of a drug transaction when seeking a conviction. The jury concluded that it had sufficient evidence upon which to convict the Defendant and, as stated above, we agree. The Defendant is not entitled to relief on this issue.

## B. Juror Misconduct

The Defendant next contends that juror misconduct occurred during the voir dire portion of his trial. He states that Juror Vicky Long stated that she did not know anyone involved in the trial, but the Defendant later learned that she had a personal relationship with the Assistant District Attorney who was prosecuting the case. He asserts that Ms. Long worked in the courthouse and went to her office during breaks, which "was contrary to the jury instructions given that she was not to discuss the case with anyone." He further asserts that another juror, Juror Joe Kerr, improperly stated that he did not know anyone involved in the case because he also had a personal relationship with the Assistant District Attorney ("ADA"). The Defendant asserts that Juror Kerr worked for the Obion County Board of Education as a principal, making him the ADA's "co-worker," and was a member of the ADA's church. These relationships, the Defendant asserts, prejudiced him. The State first asserts that this Court is precluded from ruling on this issue because the Defendant has failed to include a transcript of the voir dire on appeal. The State next notes that, based upon the record, Ms. Long was not a juror at the Defendant's trial. The State points out that the trial court also stated that he went to the same church as the prosecutor and did not know Juror Kerr. The trial court found that Juror Kerr's participation in the jury did not prejudice the Defendant.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). In Tennessee, challenges to juror qualifications generally fall into two categories: propter defectum, "on account of defect"; or propter affectum, "for or on account of some affection or prejudice." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id.* "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie

case of bias or partiality. *Id.* (citing *State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983). In reviewing the trial court's finding about disqualification of a potential juror, the standard is that the trial court's decision must be upheld on appeal absent a clear abuse of discretion. *State v. Schmeiderer*, 319 S.W.3d 607, 625 (Tenn. 2010) (appendix).

The State correctly notes that the Defendant failed to include a transcript of the voir dire in the record on appeal. In the absence of a transcript, we must normally presume that the evidence or lack thereof supports the trial court's denial of a new trial on this ground. *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). The Defendant has waived this issue by failing to provide a complete record. An appellant has the duty of preparing a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal. Tenn. R. App. P. 24(b). When the record is incomplete, or does not contain the proceedings relevant to an issue, this court is precluded from considering the issue. *State v. Miller,* 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987).

Because we do not have a transcript of the voir dire, we assume that the trial court's findings at the motion for new trial are correct. Ms. Long was not a member of the jury, she was only a member of the venire. There is no evidence that she did anything improper. Mr. Kerr was, apparently, a member of the jury but there was no evidence presented that he did anything improper or knew the prosecutor. The prosecutor informed the trial court that he had never before seen or been introduced to Mr. Kerr. Contrary to the Defendant's assertions, Mr. Kerr's employment as a school principal did not disqualify him from serving on the jury simply becuase he and the prosecutor both worked for the government. We, therefore, conclude that the Defendant has not proven that the jury was not fair and impartial. *See Howell,* 86-8 S.W.2d at 248; *State v. Thompson,* 768 S.W.2d 239, 246 (Tenn. 1989). The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced him. He asserts that the trial court improperly applied enhancement factor 14, that he abused a position of public or private trust. The Defendant states that our standard of review is *de novo* with no presumption of correctness for the determinations made by the trial court. The State counters that the trial court imposed the minimum sentence allowed by statute, three years, making the Defendant's complain irrelevant.

The jury convicted the Defendant of delivery of less than 0.5 grams of methamphetamine, a Class C felony. *See* T.C.A. § 39-17-417(c)(2)(A) (2014). The jury

also found that this offense took place within 1000' of a drug free zone. A trial court is statutorily required to order that a defendant sentenced for a violation of this code section serve at least the minimum sentence. T.C.A. § 39-17-432(c). The minimum sentence for a Class C felony is three years. T.C.A. § 40-35-112(a)(3). The trial court was required to sentence the Defendant to a sentence within the applicable sentencing range of three to six years. T.C.A. § 40-35-112(a)(3). The trial court did not afford any enhancement factors weight, as the court did not enhance the Defendant's sentence from the statutorily required minimum. The Defendant is not entitled to relief on this issue.

## D.  Cumulative Error

The Defendant finally contends that he is entitled to a new trial based upon the cumulative effect of errors that occurred. The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Odom*, 137 S.W.3d at 605 (appendix); *see State v. Guy*, 165 S.W.3d 651, 667 (Tenn. Crim. App. 2004); *State v. Mickens*, 123 S.W.3d 355, 397 (Tenn. Crim. App. 2003).

In this case, we have not found any actual error. As such the cumulative error doctrine does not apply. The Defendant is not entitled to relief on this issue.

## III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE